**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| YERBRO TURNER, | : | Case No. 1:17-cv-339 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| McCULLOUGH-HYDE MEMORIAL HOSPITAL, | : | |
| | : | |
| Defendant. | : | |

---

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (Doc. 13)

---

This matter is before the Court on the Motion for Summary Judgment submitted by Defendant McCullough-Hyde Memorial Hospital ("the Hospital"). (Doc. 13.) Plaintiff Yerbro Turner was an employee with the Hospital until he was terminated. He sued the Hospital for race discrimination and age discrimination under both state and federal law. (Doc. 1.) The Hospital seeks summary judgment on all of Turner's claims. Turner has no direct evidence that the Hospital was motivated by race or age discrimination when it terminated him. Nor does he have any other evidence to disprove the Hospital's non-discriminatory reasons for terminating him. For those reasons, explained in detail below, the Hospital is entitled to summary judgment.

### FACTS

In 1983, Yerbro Turner began working for McCullough-Hyde Memorial Hospital. (Doc. 8 at Page ID 41.) Over the years, he worked his way up from Purchasing to Buyer.

1

(*Id.* at Page ID 41-42, 48.) In 2015, the Hospital became affiliated with TriHealth, Inc. (Doc. 10 at PageID 149; Doc. 12 at PageID 366 – 67.) His duties changed after that, but he remained employed. (*See* Doc. 8 at Page ID 48.) In December 2015, the Hospital eliminated his position and he was let go, along with about twelve other people including his manager. (*Id.* at Page ID 50.) He was told to look for other job opportunities within TriHealth. (*Id.* at Page ID 51.)

Around that time, Brian Krause, Vice President of Finance of TriHealth, proposed keeping Turner in the Logistics department to address staffing concerns. (Doc. 11-2 at Page ID 319.) Ami Schlotman, a manager in the Logistics Management Office, considered that arrangement as an option. She had some concern that she was "just not seeing the initiative," but she agreed that "bringing him back in a role in the storeroom and not back in the office would be the best way to see if he can do what we need." (Doc. 11-2 at Page ID 318.)

So, shortly after Turner's position was eliminated, Darla Olson and Sharon Hancock (who was the Site Director of HR (Doc. 10 at Page ID 152)) notified him of an open position as a Supply and Distribution Technician. (Doc. 8 at Page ID 56; Doc. 8-4 at Page ID 120.) He expressed interest in the position. On December 10, 2015, he received an offer letter from Hancock on behalf of herself and Schlotman. (Doc. 8-4 at Page ID 120.) His immediate supervisor would be Carolyn Saunders. Saunders reported to Schlotman. (Doc. 8 at Page ID 59 – 60.) The offer letter advised him that he would be placed on a probationary status for the first 90 days. (*Id.*)

The Hospital's affiliation with TriHealth had brought about some changes. One

change was in the way the Hospital handled the linens. (Doc. 12 at Page ID 353 – 55, 364.) The Linen department was responsible for several different kinds of sheets, gowns, and blankets. (*Id.* at 353 – 55.) Turner, who is African-American, had linen as one of his responsibilities. (*Id.*; Doc. 1 at ¶ 11.) Other people who worked linen were Shannan Bowman, Paula Doan, and Jim Schmitt, who are Caucasian. (Doc. 12 at Page ID 343 – 44, 376; Doc. 16 at Page ID 443.) Before the TriHealth affiliation, the Hospital used linens from Hasker Textiles. (*Id.* at 352 – 53.) Turner was familiar with the linens from Hasker Textiles because he had worked with Hasker linens for years. (*Id.* at 352.) But after the TriHealth affiliation, the Hospital used linens from another company. (*Id.* at 353, 355.) Saunders, Turner's supervisor, said that the new affiliation brought about a "day and night" difference. (*Id.* at 353.) She believed that the "best way to learn" linens was "to be there to put the linen away." (*Id.* at 355.)

Some of the people with whom Turner worked, however, thought he tried to avoid the linen work. On linen days, the team had to complete the linen work before lunch. (Doc. 12 at PageID 360 – 61.) Bowman testified that Turner "didn't really pull his weight," especially when it came to the linen work. (Doc. 16 at Page ID 440.) Describing Turner's manner during linen time, Bowman stated that "[i]t was always, there's too many people in here, I'm going to go do something else, and he just wouldn't participate and help." (*Id.* at 443.)

Saunders testified along similar lines, stating, "If [the linen team was] in the hallway putting [linens] away, [Turner] would want to go to lunch, or go to lunch to avoid it, because it always came in around lunchtime." (Doc. 12 at Page ID 359.) She

received complaints about Turner from Bowman and Schmitt, as well. Bowman shared her belief that he was not pulling his weight. (Doc. 16 at PageID 442; Doc. 12 at 372.) Schmitt told Saunders that he didn't think Turner wanted to work in their department. (*Id.* at Page ID 378.) So, Saunders had a conversation with Turner about teamwork. She told him that the linen work was a team effort and that "it takes us all to do it, to learn it." (*Id.* at Page ID 360.) He replied, "Okay." (*Id.*) When asked if Turner helped the team with the linens after that conversation, Saunders said he "occasionally" did. (*Id.*) By contrast, Bowman and Doan were routinely present to help, and Schmitt would try to help if his main task in shipping and receiving did not prevent him. (Doc. 12 at PageID 363 – 64.)

These things caused Saunders to believe that Turner did not take his work at the Hospital seriously. (Doc. 12 at Page ID 364.) She testified that he had been familiar with the former protocols before the TriHealth affiliation, but "he didn't know the TriHealth side of it because things changed." (*Id.* at Page ID 365.) Saunders "would try to explain things to him, and he'd already know." (*Id.*) She testified, "I just always said, 'This is different, you've got to learn this.' " (*Id.*) But "it was hard to train someone that felt they already knew everything." (*Id.*) That was not to say Turner did nothing right. Saunders "would bump him up all the time when [she] thought he did something great." (Doc. 12 at Page ID 366.) "But there was no consistency," she testified. (*Id.*)

Reports of Turner's job performance made their way up to Schlotman. Saunders and Schlotman were "always talking about the department." (*Id.* at Page ID 394.) In those conversations, Schlotman would ask Saunders about Turner's performance. (*Id.* at

4

Page ID 351 – 52.) Saunders told Schlotman that Turner "[had] a lot to learn," that she "didn't think he took it serious," and that she thought "he felt he already knew everything." (*Id.* at Page ID 352.) She specified that the linens were one area that Turner did not take seriously. (*Id.* at Page ID 352 – 53.) She did not have issues with the other employees' job performances. (*Id.* at Page ID 394.)

Schmitt, like Saunders, also spoke with Schlotman about Turner's performance. Schlotman testified that "[b]oth had the same tone and same concern with, you know, 'We are a team, we need to work together as a team, and just being able to kind of step up and intuitively know you need to help each other out.' " (Doc. 11 at Page ID 292.) A specific cause of concern was, again, the linen. She testified that "[e]ven if there's two people working on Linen, a third isn't going to be too many working on the party, because you want to get out of there as soon as you can in a timely manner." (*Id.* at Page ID 292.)

Schlotman had direct interactions with Turner, too. During these occasions, she had conversations with him that she considered informalized coaching. (Doc. 11 at Page ID 178, 284.) On one occasion, which she memorialized in an email, she told him that everyone needed to make sure to communicate where they are. (Doc. 19-1 at Page ID 545.) If an employee is not "in Central or receiving," he would need to tell someone else where he was and what he was doing. The impetus of this conversation was "a few issue[s]" the week before when Saunders and Schlotman had to call his phone to find him. (*Id.*) (By contrast, she never had to call Schmitt, Bowman, or Doan, because they were usually in the storeroom. (Doc. 11 at PageID 305; Doc. 17 at 529.)) Turner, for his

part, denied that she told him she called his cell phone because she could not find him. (Doc. 8 at Page ID 67, 69.)

Schlotman also testified that she corrected him for going off-campus for lunch and for taking an hour-long lunch when the policy was thirty minutes. In her email, she wrote that he "got defensive about not being allowed to have an hour lunch." She told him she would double-check that the policy was in fact thirty minutes, but her "larger concern [was] that he did not seek permission." (*Id.*) Turner, again, denies Schlotman ever told him that he could only take a half-hour lunch. (*Id.*) But he admits having a conversation with her about how long lunch was supposed to be. (*Id.*)

Before Turner's 90-day probationary period was complete, Schlotman made the decision to terminate him. In preparing the 90 Day Performance Analysis ("Employment Review," *see* Doc. 8-6 at Page ID 130 – 31), Schlotman relied in part on the conversations she had had with Saunders and Schmitt about Turner's performance and teamwork. (Doc. 11 at Page ID 291 – 92.) Hancock was present with Schlotman during the meeting with Turner. Schlotman read the Employment Review to Turner. (*Id.* at Page ID 293.) The Employment Review identified the following issues as bases for Turner's termination:

- "Yerbro would go to the assigned area and determine himself if he was needed for a task or not, rather than follow instructions . . . examples being linen and receiving."

- "the Supervisor asked [Turner] to . . . cancel the remaining items on backorder. Yerbro did not follow the instructions and waited for the rest of the product to

6

arrive before completing the return."

- When Turner was having problems with running an IC130 report, the "Manager asked Yerbro to show her how he was running the report. Upon observation it was discovered that . . . Yerbro had not created the job and was not inquiring correctly. The Manager set up the job and walked Yerbro through the process, asking him to complete each step. This example shows jumping to conclusions rather than seeking answers to proactively solve the issue."

- "An observation has been that if there are multiple staff in that area Yerbro has taken it upon himself to determine he is not needed and leave the assignment with no communication to leadership."

- "During training it was observed by the Supervisor that Yerbro was clear he already knew about things and processes and was not receptive to listening to or re-learning about them as a refresher, examples being linen items. The Manager observed this as well when upon arrival one day . . . Yerbro was in the receiving office filing, and she questioned him about how the par carts and orders were going, and he was unable to provide an answer."

- "Observations from the Supervisor have shown that Yerbro is not the most motivated in a team environment. If instructed to go learn/complete a task, if there were others in the area currently doing it, he would not join in, but determine he was not needed and move on to another task without communicating what he would be doing or where he would be. On at least 2

– 3 occasions the Manager had to call his cell phone to find him or leave him a voicemail requesting him, and the Supervisor reported having similar issues locating Yerbro."

- "It was observed and brought to Yerbro's attention that he needed to be more vocal about what he was doing and where he was going, as well as he was encouraged to leave notes if no one was available . . . . There were also conversations about the 30 minute lunch (per policy) and the department's expectations about returning and not going off campus. It was also observed that Yerbro was at lunch for over 30 minutes in the lunch room on various occasions."

- "Yerbro's assumption that he knows the job responsibilities has [led] him to not ask as many questions as he might in a new environment and he has not been as open to feedback and learning as one would expect when taking on a new role and learning the skills."

- "To learn the job you need to be open and receptive to the job responsibilities . . . . One must be willing and open to communication and not defensive when feedback, constructive criticism, and direction are given. It is not acceptable to be told or asked to go and complete a task, and then determine yourself that you are not needed due to the others already doing the task. It is not acceptable to be on the clock and have your Manager or Supervisor have to call your cell phone because you did not communicate to anyone where you would be or what you would be doing."

8

- "In view of the above performance concerns, I am terminating your employment effective immediately." (Doc. 8-6 at Page ID 130 – 31.)

When asked why she did not allow Turner to complete the 90-day probationary period, she replied that Turner "wasn't adequately meeting what [the Hospital] needed in the role." (Doc. 11 at Page ID 298.)  Even though he had not completed the 90-day probationary period, she decided to terminate his employment because she "didn't want to prolong him in the department where it wasn't productive for [the Hospital] and just string him along the full 90 days." (*Id.*)  When Bowman learned about Turner's termination, she was "not . . . surprised." (Doc. 16 at Page ID 440.)  Neither was Saunders, when she learned that he had not even completed the full 90-day period. (Doc. 12 at Page ID 374.)

## ANALYSIS

The defendant is entitled to summary judgment when "the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). The Court must "construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). When the defendant has met its initial burden of showing that no genuine issue of material fact remains, the plaintiff must "set forth specific facts showing that there is a

9

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "To make out a *genuine* issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

## I.    No wrongful termination motivated by bias against age or race

Turner alleges the Hospital discriminated against him because of his age (he was 58 when he filed his complaint) in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and R.C. § 4112.02. (Doc. 1 at ¶¶ 44 – 53.) He also invokes both state and federal law in alleging the Hospital discriminated against him for his race. He claims violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*, and Ohio Revised Code § 4112.02, alleging he was discriminated against because he is African American. (Doc. 1 at ¶¶ 34 – 43.)

The Ohio Supreme Court applies federal case law interpreting Title VII of the Civil Rights Act when addressing claimed violations of Ohio Revised Code Chapter 4112. *E.g., Little Forest Medical Center v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10, 575 N.E.2d 1164 (1991); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196-97, 421 N.E.2d 128, 131 (1981). So both the state and federal claims can be analyzed under the federal framework. *E.g., Mauzy v. Kelly Servs., Inc.*, 75 Ohio St. 3d 578, 582, 664 N.E.2d 1272, 1276 (1996); *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 469 (6th Cir. 2002).

To survive summary judgment, Turner must satisfy the three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First,

he must establish a prima facie case of discrimination. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). If he can make out a prima facie case, then the Hospital must "articulate some legitimate, nondiscriminatory reason" for the termination. *Id.* (quoting *McDonnell Douglas Corp*, 411 U.S. at 802. If the Hospital does so, then the burden shifts back to Turner to show that the reason was not the real reason—that is, "the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Summary judgment is only appropriate if there is insufficient evidence to create a genuine dispute of material fact "at each stage" of the analysis. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

### A. Prima facie case

Without direct evidence of discrimination, Turner must establish (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination. *Blizzard*, 698 F.3d at 283. The only element at issue here, for both the age and race claims, is the fourth.

#### 1. Age

Turner claims that the language Schlotman used in her ratings for Turner raise an inference of age bias. Schlotman wrote that Turner was "not receptive to listening to or relearning about [things and processes] as a refresher." (Doc. 8-6 at Page ID 131.) She also observed that he had not been "open to feedback." (*Id.*) Turner says that these terms evince age bias and "breath[e] life into the common stereotypical assumptions . . . that older employees are resistant to change and cannot learn new things." (Doc. 20 at Page ID 589.)

11

The Court is not convinced, on this record, that discriminatory animus underlies Schlotman's observations that Turner was not receptive to learning or open to feedback. For an employee to do his job, he needs to be willing to *learn* how to do his job. A lack of receptivity to learning thus poses an obstacle that an employer is perfectly justified in identifying. Schlotman's comments evince no age bias—they evince an employer's evaluation of an employee's willingness to learn how to perform his duties. Such an approach is consistent with the ADEA's requirement that employers evaluate their employees based "on their merits and not their age." *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 422 (1985). And, here, the employer's observations about a lack of receptivity and openness to feedback were not about Turner's age. They were about his merits as an employee.

The supposed stereotype Turner finds in this record is not enough to raise an inference of discrimination. Responding to questions by Turner's attorney about age stereotypes, Hancock testified in her deposition that she was aware that stereotypes based on a person's age exist. (Doc. 10 at Page ID 154 – 158.) Hancock stated she was aware of the stereotype that an older worker may not be as productive as a younger worker. (*Id.* at 155.) Turner's attorney asked Hancock if she was aware of "any stereotypes that could be age-based regarding them being resistant to change." (*Id.*) Hancock answered, "Yes, I've heard that." (*Id.*) Turner uses this anemic piece of testimony to argue that the Hospital's termination of him "breath[ed] life into the common stereotypical assumptions articulated by Hancock that older employees are resistant to change and cannot learn new things." (Doc. 20 at Page ID 589.)

12

Turner's stereotype theory does not persuade this Court and it would not persuade any reasonable jury. *See Olive v. Columbia/HCA Healthcare Corp.*, No. 75249, 2000 WL 263261, at *6 (Ohio Ct. App. Mar. 9, 2000). Turner bears the burden of proving that intentional discrimination took place when the Hospital terminated his employment. It is not enough to show that stereotypes exist and that the employer knows about them. *See E.E.O.C. v. Wal-Mart Stores, Inc.*, No. CIVA 6:01-CV-339-KKC, 2010 WL 583681, at *4 (E.D. Ky. Feb. 16, 2010). "To evaluate an individual worker . . . as lacking . . . initiative, commitment . . . or other desired characteristics is not to indulge in age stereotypes, and is indeed the kind of evaluative approach that the antidiscrimination laws seek to encourage." *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 672 (7th Cir. 1998); *Halliwell v. N. White Sch. Corp.*, No. 4:13-CV-084 JD, 2016 WL 795893, at *8 (N.D. Ind. Mar. 1, 2016) ("If anything it is prejudicial to assume that descriptors such as 'lack of effort to keep current' categorically apply to the older population."). Schlotman's evaluation was within the bounds of the age antidiscrimination laws because it focused substantively on his job performance, not his age. This record fails to raise the inference that the employer evaluated Turner based on generic stereotypes rather than the substance of his performance.

Further factors militate against a prima facie case of age discrimination. First, Turner was not replaced by a younger worker. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008). Indeed, no one replaced him after he was terminated. (Doc. 11 at Page ID 240; Doc. 12 at Page ID 278 – 80.) Second—and critically—Turner does not identity the ages of the other employees who kept their jobs (Bowman, Doan, and

Schmitt).  In fact, Bowman testified that "we're all old in that department."  (Doc. 16 at Page ID 485.) She testified that Doan was in her late 50s or early 60s. (*Id.*) Schmitt testified he was born in 1952, making him at least 60 during the time in question.  (*See* Doc. 17 at Page ID 533.)   Turner has thus failed to show that the comparators were in a non-protected class.  *Mickey*, 516 F.3d at 522.  So, on this record, no reasonable jury could find that similarly situated younger employees received more favorable treatment than Turner.

### 2.  Race

Turner may satisfy the fourth element if he can show disparate treatment between himself and non-protected, similarly situated employees.  *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009).  The Sixth Circuit, however, has found that the lack of similarly situated comparators is not always fatal to a prima facie case, so long as the plaintiff points to "additional evidence that indicates discriminatory intent in light of common experience."  *Id.* (cleaned up).  This showing constitutes the necessary "inference of discrimination" required for making a prima facie case.  *Id.*

In attempting to establish a prima facie case of race discrimination, Turner argues that (1) he was treated less favorably than his white coworkers and (2) evidence of reliance on racial stereotyping and subjective decision-making raises an inference of discrimination.  The Court will consider these issues in turn.

1.   Turner claims that he was the only African American employee in the department and also the only employee out of the group of four Supply Technicians to receive an evaluation before the 90-day probationary review period ended.  (Doc. 20 at

Page ID 582.)  Some of the other employees also received a chance to comment on their review, while Turner did not.  He also received phone calls about his whereabouts, while other coworkers did not.

On this record, Turner and his proposed comparators are not similarly situated. Turner "need not show an exact correlation" between himself and others similarly situated, but he still must show that he is "similar to [his] proposed comparator in 'all relevant respects.' "  *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020) (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).  At the prima facie stage—more liberal than at the pretext stage, to be sure—"substantially similar conduct can suffice to establish comparator status."  *Id.*  But even under the liberal prima facie standard, Turner has not identified any other employees whose conduct is substantially similar to his own.

A district court "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  This Court finds that relative job performance is a relevant aspect of employment.  *Miles*, 946 F.3d at 894 (no substantially similar conduct when plaintiff's conduct was worse than comparators' conduct).    Saunders, Turner's supervisor, testified that there were prolonged issues with Turner's job performance.  Based on her routine encounters with him, he did not take his role in the linen department seriously, he would avoid helping the team with linens, and he resisted her attempts to teach him how to do better by acting like he already knew (Doc. 12 at Page ID 352, 359, 364 – 65.)  By contrast, nothing in the

record suggests that Turner's proposed comparators had similar job performance issues. In fact, the opposite is true—critically, Saunders did not have issues with the job performances of her other employees. (*Id.* at Page ID 394.) So this is not a case in which both the plaintiff and his comparators had engaged in conduct that warranted corrective action or an adverse employment action, but only the plaintiff was disciplined. *Compare Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Accordingly, Turner is not similarly situated with the white employees who kept their jobs.

The calls Schlotman made to Turner do not change the calculus. Turner testified that she called his phone more than twice, but not more than six times. (Doc. 8 at Page ID 76.) He did not recall talking with her on the phone.[1] (*Id.*) Schlotman acknowledged that she did call him "a couple of times . . . one time in particular . . . to meet with him" when she was not able to find him. (Doc. 11 at Page ID 304.) By contrast, she never called Bowman, Doan, or Schmitt because they would usually be in the storeroom. (Doc. 11 at Page ID 305; Doc. 17 at Page ID 529.) Thus, the record shows that the other employees did not receive calls because the employer *could* find them, but Turner received calls because the employer *could not* find him. Upon consideration, then, Turner has failed to identity any similarly situated employee who was treated better than he was.

Lastly, Turner also raises an issue, which he claims is disputed and material,

---

[1] Turner used an errata sheet to attempt to clarify his deposition testimony on the subject of phone calls from Schlotman. (Doc. 15 at Page ID 430.) He explained that he did remember receiving the calls and that Schlotman asked him where he was, but could not remember the specifics. But based on Sixth Circuit guidance—casting disfavor on errata sheets that attempt to change the substance of a deponent's testimony—the Court has disregarded the errata sheet. *Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560, 565 (6th Cir. 2009); *Shahbabian v. TriHealth G LLC*, No. 1:18-CV-790, 2020 WL 4346938, at *1 (S.D. Ohio July 29, 2020).

involving his being reprimanded for having an alleged discussion with another employee about salary. The Court finds this issue immaterial. A disputed fact is material only if its resolution would affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). The substantive law on this issue implicates the third prima facie element—an adverse employment action. "An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Johnson v. Franklin Farmers Co-op.*, 378 F. App'x 505, 508 (6th Cir. 2010) (cleaned up). Here, the salary issue was not one of the stated grounds for termination in the Employment Review. The record reveals no indication that the salary issue resulted in a significant change in Turner's employment status. So it is de minimis and not actionable. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

2. What about "additional evidence that indicates discriminatory intent in light of common experience"? *Lindsay*, 578 F.3d at 418 (cleaned up). That question "depends on the attendant facts and circumstances." *Id.* Turner appears to attempt to satisfy the easier *Lindsay* standard by offering a lengthy discourse on the relationship between racial bias and stereotypical associations.

Turner contends that, even if people do not endorse stereotypical beliefs, "they are familiar with cultural stereotypes that associate Blacks and African Americans with (mostly negative) characteristics including aggression, laziness, unintelligence, and dishonesty." (Doc. 20 at Page ID 586.) These associations, he suggests, "need not be

invoked consciously to give rise to prohibited discriminatory conduct under Title VII."

(*Id.*) And, he argues, these stereotypes manifested in emails Schlotman wrote about interactions she had with him. She described Turner as being "very erratic in his movements and head movements and loud in voice" and "defensive" and commenting that he "made some loud breathing noises and crossed his arms." (Doc. 19-1 at Page ID 545; Doc. 10-1 at Page ID 217.) He suggests these are stereotypes for a "lazy" and "angry or aggressive black man." (Doc. 20 at Page ID 587 – 88.)

The Hospital takes a different view. It argues that a belief that is implicit or unconscious is not intentional and is therefore irrelevant to claims about intentional discrimination. (Doc. 21 at Page ID 713.) The Hospital further maintains that Turner has provided nothing more than his personal beliefs that Schlotman, Saunders, or anyone else experienced these unintentional feelings.

The Hospital is correct. "To prevail under the disparate treatment theory, a plaintiff must show that he has been the victim of *intentional* discrimination." *Daniels v. Bd. of Educ. of Ravenna City Sch. Dist.*, 805 F.2d 203, 206 (6th Cir. 1986) (emphasis added). "The burden . . . is on the plaintiff to prove that intentional discrimination occurred at this particular [employer], not just that [] stereotyping or intentional discrimination is prevalent in the world." *E.E.O.C. v. Wal-Mart Stores, Inc.*, No. CIVA 6:01-CV-339-KKC, 2010 WL 583681, at *4 (E.D. Ky. Feb. 16, 2010).

Turner's discussion of implicit bias and stereotypical associations does not get to the heart of the issue of whether Schlotman or Saunders *intentionally discriminated* against him. *See Leisring v. Hamilton Cty. Clerk of Courts*, No. 1:18-CV-698, 2020 WL 1554085, at

*2, fn. 3 (S.D. Ohio Apr. 1, 2020). The only supports he offers for his claim that they did discriminate against him are the emails Schlotman wrote about her encounters with him, where she described his "very erratic . . . head movements" and so on. (*See* Doc. 19-1 at Page ID 545; Doc. 10-1 at Page ID 217.) Two problems confront his reasoning.

First, it is a stretch to claim that to describe a person as having erratic head movements and making loud breathing noises is to devolve into stereotyping an "angry or aggressive black man." (Doc. 20 at Page ID 587.) It is also a bridge too far to claim that descriptions about Turner's lack of initiative are really just stereotypes for "lazy." (*Id.* at Page ID 588.) These claims do not flow reasonably from this record. Here, it is the employee, not the employer, who is engaging in stereotypes. As he did with his age claims, the employee is overlaying the employer's legitimate observations with negative stereotypes. But that does not demonstrate that the employer intentionally stereotyped the employee, nor that the employer intentionally discriminated against the employee. The employer was simply engaging in an evaluative approach that assessed the employee based on the substance of his job performance, rather than any illegitimate consideration. *See Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 672 (7th Cir. 1998); *Halliwell v. N. White Sch. Corp.*, No. 4:13-CV-084 JD, 2016 WL 795893, at *8 (N.D. Ind. Mar. 1, 2016). No reasonable jury would find otherwise.

Second, Turner avoids quoting key bits of context from Schlotman's email. He tells the Court that Schlotman described him as "very erratic" and "loud," and suggests these are stereotypes for "an angry or aggressive black man." (Doc. 20 at Page ID 487.) But Schlotman went on to say that "I assume that was just nervousness in speaking with

me." (Doc. 19-1 at Page ID 545.) So Schlotman's comments, in context, completely dispel any reasonable suggestion that Schlotman was perpetuating a stereotype. She herself acknowledged he was probably just nervous.

In light of the above, Turner has failed to set out a prima facie case of discrimination based on his age or race.

### B. Legitimate nondiscriminatory reasons

Here, even if Turner could establish a prima case for his discrimination claims, the Hospital has satisfied its burden to show that it had legitimate, nondiscriminatory reasons for terminating him, *see supra* at 6 – 8. Common themes in those observations are that Turner was unreceptive to learning his new position, he failed to follow directions, and he was not good at communicating his whereabouts. (Doc. 8-6 at Page ID 130 – 31.) The Hospital argues that Turner's lack of initiative, as borne out by the Employment Review and testimony, constitutes a legitimate nondiscriminatory reason for firing him.

Lack of initiative is a legitimate, nondiscriminatory reason for terminating an employee. *White v. Crystal Mover Servs., Inc.*, 675 F. App'x 913, 914 (11th Cir. 2017); *Ajao v. Bed Bath & Beyond, Inc.*, 265 F. App'x 258, 263 (5th Cir. 2008). Furthermore, the totality of the reasons listed in the Employment Review constitute a legitimate, nondiscriminatory reason for terminating him. Since the Hospital has articulated legitimate, nondiscriminatory reasons for terminating Turner, Turner must be able to establish that those reasons are a pretext and that the real reason is discriminatory.

### C. Pretext

Turner suggests that his employer's reasons for terminating him are pretextual.

To survive summary judgment at the pretext stage, an employee must "produce sufficient evidence from which a jury could reasonably reject [his employer's] explanation of why it fired [him]." *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Pretext is a commonsense inquiry. *Chen*, 580 F.3d at 400, fn. 4. "Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* at 400. These are not the only ways a plaintiff may establish pretext, but they focus on the ultimate question: did the employer fire the employee for the stated reasons or not? *Id.* at 400, fn. 4.

Turner's attempts to demonstrate pretext are all unavailing.

**1. *Teamwork and following instructions*.** Turner disputes—but without any cite to the record—the Hospital's "unfounded" claims that he could not be found in the Hospital or that he tried to avoid linen work. (Doc. 20 at Page ID 591.) To establish pretext by challenging the factual basis of an employer's proffered termination rationale, the plaintiff must provide evidence that the employer's allegations never happened. *Miles*, 946 F.3d at 888–89. This Turner cannot do.

Saunders and Bowman corroborate the bases in fact for the Hospital's positions in the Employment Review. Saunders testified that Turner would try to avoid linen duty when the team was "in the hallway putting [the linen] away" by either expressing his desire to go to lunch or simply going to lunch. (Doc. 17 at Page ID 359.) She corrected

him, explaining that linen was a team effort, but—based on her testimony that he would "occasionally" help with the linens after her correction—correcting him was not enough to motivate his full commitment to the job. (*Id.* at Page ID 360.) Bowman too testified that he "didn't really his weight," especially with linen duty. (Doc. 16 at Page ID 440, 443.) According to her, his excuse was "always, there's too many people in here, I'm going to go do something else, and he just wouldn't participate and help." (*Id.* at Page ID 443.)

Given this evidence, the Hospital's bases for terminating him are far removed from "unfounded," as Turner claims. To the contrary: the evidence supports the statements in the Employment Review that Turner "would go to the assigned area and determine himself if he was needed for a task or not, rather than follow instructions" and, "if there are multiple staff in that area, Yerbro has taken it upon himself to determine he is not needed and leave the assignment area with no communication to leadership." (Doc. 8-6 at Page ID 130, 131.)

Turner does not provide evidence that Saunders or Bowman are wrong. He simply disputes the Hospital's statements in his response brief, without any apparent support from the record. Argument is not evidence—but argument is all Turner musters. *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017). That is not enough to show that the Hospital's allegations "never happened." *Miles*, 946 F.3d at 889.

**2. *Probationary period*.** Turner claims that the Hospital permitted the white employees to finish their probationary periods before giving them their 90 Day Performance Analysis review. (Doc. 19-1 at Page ID 555 (Bowman's review, following

22

her successful completion of the probationary period); *id.* at Page ID 557 (Doan's review, same).) But in his case, the Hospital reviewed his performance before the 90-day period was up. (Doc. 8-6 at Page ID 130.)

Cases in which disparate treatment has sufficed to establish pretext "usually involve circumstances where a company tolerates a certain type of misconduct, leaving it unpunished, but singles out and punishes the plaintiff for that same type of misconduct." *Miles*, 946 F.3d at 894. That is not this case. As discussed in the prima facie section, Turner failed to identify substantially similar comparators with respect to job performance. There is a "closer correlation required for the comparators' conduct at the pretext stage." *Id.* Turner must point to comparators who have engaged in substantially *identical* conduct. *Id.* If he could not meet the substantially-similar standard, he cannot meet the higher substantially-identical conduct standard. *See id.*

To be sure, "a refusal to impose the same discipline on similarly situated employees who commit 'substantially identical conduct' can be evidence of pretext." *Turner v. Marathon Petroleum Co., LP*, 804 F. App'x 375, 378 (6th Cir. 2020). But Turner has not shown that the other probationary employees were similarly situated. The record clearly shows that Turner had job performance issues, but the other probationary employees did not. *See supra* at 14 – 16. Consequently, their conduct was not substantially similar, much less substantially identical. *Miles*, 946 F.3d at 894. Turner has thus failed to put forth any affirmative evidence that he is similarly situated with the white employees who survived their 90-day probationary period. No reasonable juror could find that the Hospital's disparate treatment of Turner and the other probationary

23

employees was based on animus towards Turner's age or race. *See id.* at 895.

   **3. *Disciplinary policy*.**   Turner argues that the Hospital did not follow its own Performance Standards and Conduct Policy in terminating him.   That policy states that, when performance problems occur, "the disciplinary approach will focus on solving the problem(s) through a process of corrective counselling."   (Doc. 19-1 at Page ID 546.)

   "[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005); *Marshall v. Belmont Cty. Bd. of Comm'rs*, 110 F. Supp. 3d 780, 791 (S.D. Ohio 2015), *aff'd*, 634 F. App'x 574 (6th Cir. 2016) ("As a general rule, an employer's failure to follow its own policies will be insufficient by itself to establish pretext.").   In an unpublished opinion, however (issued before *White*), the Sixth Circuit posited that "an employer's failure to follow a policy that is related to termination or demotion can constitute relevant evidence of pretext," but generally only in combination with other probative evidence that demonstrates pretext. *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005).   In *DeBoer*, the panel found that an employer's failure to follow its internal policy, when combined with several other pieces of probative evidence, "barely" qualified to demonstrate pretext. *Id.* at 395.

   The record shows that both Saunders and Schlotman did counsel and informally coach Turner to correct his job performance. (Doc. 11 at Page ID 178, 284; Doc. 12 at Page ID 365.)   It does not show that the Hospital engaged in a formal correction policy including written reprimands or anything other than informal, on-the-spot correction. But, to the extent it is probative at all, the fact that the Hospital informally corrected

24

Turner rather than formally corrected him is not enough to demonstrate pretext, even under the reasoning employed in the unpublished *DeBoer* decision. In *DeBoer*, recall, the employer's failure to follow its policy, combined with several other pieces of evidence, "barely" demonstrated pretext. *Id.* Turner has much less to marshal here.

In light of the performance issues identified in the Employment Review and corroborated by testimony, the Hospital's apparent failure to strictly follow its internal formal correction policy is not enough to submit this case a jury. *See White*, 429 F.3d at 246; *Johnson v. Potter*, 323 F. App'x 467, 469 – 70 (7th Cir. 2009) ("we evaluate only whether the employer honestly believed the justification it gave for discharging him, not whether it was consistent with the employer's own policies, fair, or even correct").

**4. *Lunch policy.*** Turner disputes that his performance was problematic, arguing that, after the conversations Schlotman had with him about the lunch policy, he subsequently followed her instructions. He also disputes that he failed to obtain permission to leave the campus in the first place. The lunch conversation, however, factored only slightly into the Employment Review and the Employment Review articulated adequate and more detailed grounds to terminate Turner. Thus, the lunch policy issue would not affect the outcome of the case. Accordingly, the Court finds this issue immaterial. *Niemi v. NHK Spring Co.*, 543 F.3d 294, 299 (6th Cir. 2008).

## CONCLUSION

Based on the foregoing, the Court **GRANTS** the Hospital's motion for summary

judgment (Doc. 13).  This case shall be **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND